# CHAPTER 9 – USE OF FORCE

**REV. APRIL 15, 2014**

**9.01 POLICY**

It is the policy of the Bexar County Sheriff's Office that deputies use only the force that reasonably appears necessary to effectively bring an incident under control, while protecting the lives of the officer and others the use of force must be objectively reasonable. The deputy must only use that force which a reasonably prudent officer would use under the same or similar circumstances.

**9.02 PURPOSE**

A.      The purpose of this policy is to provide law enforcement deputies of this agency with guidelines for the use of deadly and non-deadly force.  Force may be necessary:

>   1.   When necessary to preserve the peace, prevent commission of offenses, or prevent suicide or self-inflicted injury;
>
>   2.   When making lawful arrest and searches, overcoming resistance to such arrests or searches, and preventing escapes from custody;
>
>   3.   When in self-defense, or defense of another, against unlawful violence to person or property;
>
>   4.   When preventing or interrupting an intrusion on or interference with the lawful possession of property.

B.      In each instance of the use of force, the officer should exhaust every reasonable means of employing the minimum amount of force to affect an objective before escalating to the next, more forceful method.  However, an officer is not required to engage in prolonged combat or struggle rather than resorting to that method which will most quickly and safely bring the situation under control.

C.      The amount and degree of force used in attaining a law enforcement objective as authorized by Texas law is determined by the exercise of good judgment, common sense, logic, and the circumstances surrounding the incident, including but not limited to the:

>   1.   Nature of the case;
>
>   2.   Behavior of the subject against whom the force is to be directed;
>
>   3.   Actions by third parties who may be present;
>
>   4.   Physical conditions; and
>
>   5.   Feasibility and/or availability of alternative actions.

D.      Deputies may use reasonable force to overcome resistance in the lawful performance of duties, even though there is no immediate or apparent danger calling for self-defense.  However, deputies must

**Effective date April 30, 2014**                    100

be acting within the scope of their official authority. Every reasonable opportunity to comply with the request for cooperation must be given to the person and force used only after all other reasonable means have failed to produce compliance.

E.      Before using reasonable force, deputies shall identify themselves as deputies and state their purpose to the offender and others immediately present, unless they reasonably believe their purpose and identity are already known or cannot reasonably be made known.

F.      Where possible, an officer will use verbal persuasion first, followed thereafter in ascending order, by:

1.   Physical strength and skill, ranging from restraint and come along holds to hand or foot strikes;

2.   Approved ASP® baton used in the prescribed manner, chemical agents, Electronic Control Device (ECD)/Electronic Control Weapon (ECW); and

3.   Approved firearm. Deputies must bear in mind the order of this continuum of force is not absolute, and the situation may require immediate use of a higher level of force.

G.      Each instance of the use of force requires that restraint be exercised to avoid exceeding the force necessary to control a situation. Generally, the use of force against another is not justified in response to verbal provocation alone.

**9.03 DEFINITIONS**

A.      Force - can range anywhere from verbal persuasion exceeding normal conversation to physical strength and skill, designated chemical, Taser™ , baton or similar instrument not designed to cause serious bodily harm.

B.      Necessary force - is that force which does not exceed the minimum amount and degree of force sufficient to achieve a legitimate law enforcement objective.

C.      Deadly force - is that force which is intended or known to cause, or by the manner of its use or intended use is capable of causing death or serious bodily injury.

D.      Reasonable grounds - are those set of facts or circumstances, based on reliable and trustworthy information, personal knowledge, or observation, which reasonably shows and would warrant an ordinary, prudent person, in the same or similar circumstances, to believe that a particular person is guilty or is about to commit some offense against the law.

E.      Less lethal weaponry - is a degree lower than traditional weapons such as firearms. For the purposes of this policy, the term "less lethal weaponry" includes, but is not limited to pepper spray, pepper ball, distraction devices, Taser™ , etc...

F.      Non-deadly force - is force applied with the intention to subdue or render a subject non-threatening, with a lower probability of effecting fatal consequences.

**Effective date April 30, 2014**                    **101**

G.      Defense of third person - A person is justified in using force or deadly force against another to protect a third person if:

1.   Under the circumstances as the actor reasonably believes them to be, the actor would be justified in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and

2.   The actor reasonably believes that his intervention is immediately necessary to protect the third person.  To protect his/her own life or that of another.

3.   To prevent the escape of one who has committed or attempted to commit a forcible felony which involves the infliction or threatened infliction of great bodily harm or is attempting to escape by use of deadly weapon or otherwise indicates that he/she will endanger human life or inflict great bodily harm unless arrested without delay.

G.      An approved weapon - is one that is approved by the BCSO.

1.   BAND-IT™ (ECD) - A remotely operated electronic restraint device which produces an electrical shock of 50,000 volts for 8 continuous seconds that can disorient, temporarily immobilize and stun a person without causing permanent injuries. It is activated by a radio transmitter with a range of up to 175 feet.  The device may be used in combination with other restraints such as handcuffs, belly chains and leg irons.

2.   An ASP® expandable baton. Authorized baton is (16) sixteen inches for plainclothes officer and a (21) twenty-one inch or a (26) twenty-six inch baton for uniformed Deputies

3.   Taser™ (ECW) - A device designed to disrupt a subject's motor and sensory nervous system through the use of electrical energy sufficient to cause Neuro-Muscular Incapacitation. Only authorized Bexar County Sheriff's Office Tasers™ shall be carried by Bexar County deputies.

   a.   SPARK TEST: A non-contact demonstration of the Tasers™ ability to discharge electricity. This is accomplished without the cartridge. When activated the unit will visually display an electrical arc between the electrodes.

   b.   DEPLOYMENT: The intentional discharge of a Taser™ at or towards a subject using either the probe or drive stuns modes. This does not include a spark test or an accidental discharge.

   c.   PROBE: A metal dart which is propelled from the cartridge.

   d.   Anti – FELONY IDENTIFICATION Device (AFID): Bar - coded serialized ID tags which resemble confetti.  AFID's are discharged from the cartridge when the Taser™ is deployed in probe mode.

4.   Oleoresin Capsicum (OC) Pepper spray MK III / MK IVB size unit Pepper Mace.

**9.04 TRAINING**

A.      Only deputies who have successfully completed the prescribed training course and received proper certification which assures safe and proper handling of this equipment shall be eligible/ authorized to use/dispense these items in the performance of their duties. No deputy shall carry/dispense any of this equipment without proper training, certification, and approval.

B.      This training will be properly documented, approved by the BCSO Academy Commander, and in the deputies training file at the BCSO Training Academy and as appropriate in Personnel Administration.

**9.05 AUTHORIZED INSTRUMENTS OF PHYSICAL FORCE**

A.      Deputies assigned to law enforcement duties are authorized to and shall carry and wear all of the following instruments of physical force while on-duty:

      1.   Authorized weapon and ammunition.

      2.   At least one less lethal weapon: An ASP® expandable baton, Taser™ or OC Spray as authorized.

      3.   A set of handcuff(s).

B.      In addition to the above mandatory instruments of force, the law enforcement officer may also carry the following while on-duty:

      1.   A knife with a blade no longer than 5 ½ inches;

      2.   A back-up firearm which the officer has received written authorization to carry and has qualified with on the firing range.

C.      Deputies assigned to detention (when outside the secure areas of the Jail) shall carry and wear the following instruments of force while on-duty:

      1.   Licensed Peace Officers: Authorized weapon and ammunition. (Refer to chapter 8 in this manual).

      2.   Licensed Jailers: Authorized weapon and ammunition. (Refer to chapter 8 in this manual).

      3.   Two pair of handcuffs. Officer may also carry an ASP® baton, TASER or OC Spray if the officer is certified in its use.

D.      Deputies assigned to plain clothes, investigations, special or undercover assignments shall carry the following instruments of force while on-duty:

      1.   Authorized weapon and ammunition

      2.   At least one set of handcuffs

      3.   At their discretion, one less lethal weapon of their choice

4. As determined by the Chief Criminal Investigations Division, with the Sheriff's approval any weapon deemed necessary to conduct undercover operations, including those specifically prohibited in paragraph 9.06.

## 9.06 NON- AUTHORIZED INSTRUMENTS OF PHYSICAL FORCE

All deputies are prohibited from carry the following while in uniform on-duty or in uniform working off-duty.

A.   Any handgun other than a BCSO authorized weapon, or an authorized back-up weapon.

B.   Any nightstick or baton other than the authorized ASP® expandable baton;

C.   Any illegal or unauthorized knife such as a stiletto or a knife with a blade exceeding 5 ½ inches;

D.   Any illegal or prohibited firearm/weapon or grenades;

E.   Brass knuckles;

F.   Slipper, or saps;

G.   Nunchakus; or

H.   Stun guns.

**EXCEPTION:** The Chief Criminal Investigations Division, with the Sheriff's approval, may approve any weapon deemed necessary to conduct undercover operations, including those specifically prohibited in paragraph 9.06.

## 9.07 USE OF FORCE - NON DEADLY

It is the policy of the Bexar County Sheriff's Office to protect life by any legal means necessary and use the least amount of force in order to affect an arrest or quell a violent disturbance. Deputies responding to an incident where use of force is required may attempt to utilize less lethal weaponry when applicable.

A.   The philosophy driving this policy recognizes that violent people will be stopped before harm or injury is inflicted to innocent victims, bystanders, self, and or Deputies responding to the incident. It is the duty and responsibility of the initial responding deputy(s), to use all legal means to restore order.

B.   The prioritization of activities in their order of importance are:

1. Stop the violent/aggressive behavior with the least amount of force necessary to affect the arrest or quell the disturbance. If possible by the use of less lethal weaponry when/where applicable.

2. Rescue the victims.

3.   Provide medical assistance to the victim(s) and actor(s).

4.   Preserve the crime scene.

## 9.08 PROCEDURES-GENERAL

A.      The first deputy on the scene will determine if deadly or less lethal weaponry is applicable and advise the on duty supervisor.  Whenever possible, the deputy shall standby for the on duty supervisor. The on duty supervisor will make the scene and take control of the situation.

B.      The deputy carrying the less lethal weapon will always have a cover Deputy in position ready to use deadly force if needed.

C.      In a detention situation, a S.E.R.T. team member will stay with the person deploying less lethal weaponry.

D.      Medical personnel will be notified and stage in the immediate area to treat the recipient of non-deadly force and/or deputies.

E.      Deputies will not use "less lethal" weaponry as a pain compliance technique when the subject(s) are restrained in handcuffs and are only verbally resistant.

## 9.09 LESS LETHAL WEAPONRY

A.      Only authorized "less lethal weaponry" will be used / dispersed where applicable.

B.      The "less lethal weaponry" authorized by the Bexar County Sheriff's Office are:

1.   Pepper ball Launcher: Jaycor SA 200 launcher with live PAVA (Capsaicin II) powder projectile, scented inert powder projectile, inert liquid projectile, glass-shattering projectile. (SWAT, ERT, and SERT specific).

2.   Oleoresin Capsicum (OC) Pepper spray:  MK III / MK IVB size unit Pepper mace, MK III / MK IVB Pepper foam MK IX Pepper foam.

3.   Taser™ - Electronic Control Weapon (ECW).

4.   Distraction device(s):  Defense Technology/Federal laboratories Multi port plus non bursting canisters, 7001 command initiated (CI), stinger grenade rubber ball, stinger grenade rubber ball & OC, aerial diversion 12. (SWAT, ERT, and SERT specific).

5.   ASP® - Expandable Baton.

6.   BAND-IT™ Electronic Control Device (ECD).

## 9.10 USE OF DEADLY FORCE

A.      Preparation for use of deadly force.

**Effective date April 30, 2014**                    **105**

1.  To effectively accomplish their duties, it is recognized that during certain situations, an officer may find himself in a position of having to threaten the use of deadly force to thwart an arising situation possessing the immediate potential of leading to the necessity to protect life or prevent serious bodily injury.

2.  Deputies may make special preparations for the use of deadly force as they observe the need to do so, consistent with 9.05, above. Examples of preparatory steps include, but are not all-inclusive:

    a.  Releasing the safety strap on holster;

    b.  Placing the hand on pistol grips;

    c.  Removing the firearm from its holster or pointing the firearm; or

    d.  Removing the shotgun /rifle from the patrol vehicle.

    e.  Generally, an officer may use deadly force only in situations, which indicate that, the officer or another person may be seriously injured or killed in the deadly force is not used.

    f.  "Deadly force" means force that is intended or known by the actor to cause, or in the manner of its use or intended use, is capable of causing, death or serious bodily injury:

        1)  The discharge of a firearm is deadly force if directed at a person or at a location where persons may be;

        2)  The use of a choke hold (carotid choke) calculated to induce unconsciousness IS DEADLY FORCE;

        3)  The use of an ASP® baton to the head, face, throat, neck, or kidney IS DEADLY FORCE;

        4)  Striking a person in the head, face, throat, neck, or kidney with a flashlight IS DEADLY FORCE;

        5)  Heavy or repeated strikes to the head, face, throat, neck, or kidney with the hands or feet may be considered DEADLY FORCE under certain circumstances.

    g.  It shall be incumbent on every officer to exhaust every reasonable means of employing only that amount of deadly force necessary to accomplish the purpose.

    h.  Where feasible, a verbal warning shall be given to the offender prior to the use of deadly force.

    i.  Once the immediate danger of death or serious bodily injury to an officer or another person has passed, deadly force shall not be used.

j.  To the extent an officer has reasonable time for consideration, he shall never use deadly force which creates a greater risk to self and others (such as hostages, bystanders, and other Deputies) of death or serious bodily injury, than if he did not use such deadly force. This decision must reflect the circumstances, for example:

   1)  The nature and seriousness of the risk of injury;

   2)  The age, physical condition, and behavior of the suspect;

   3)  Relevant action by any third parties;

   4)  Physical conditions at the scene, such as visibility;

   5)  The feasibility of alternative actions; and

   6)  The opportunity and actual ability of the suspect to injure the officer or others.

k.  Deadly force against one who is fleeing from custody or who is fleeing immediately after committing a felony offense is prohibited, unless immediately necessary to protect against a substantial and immediate risk that the subject will cause death or serious bodily harm to the officer or a third person.

l.  A Carotid Neck Hold is considered to be deadly force even if the only objective is to induce temporary unconsciousness. This application of force is also referred to as a carotid neck restraint or a carotid chokehold. Regardless of the name used, it is described as the application of force or pressure to the neck or throat of the suspect. This technique is unauthorized except in situations where the officer would be justified in using deadly force against an individual.

m. Striking a suspect anywhere on the body with a metal or plastic flashlight is unauthorized. Deputies are not to use their flashlights as clubs or nightsticks. Striking anyone with a flashlight is only acceptable in situations where the officer would be justified in using deadly force against an individual.

n.  The following are examples which may be considered deadly force situations depending on the circumstance:

   1)  Shooting at, or stabbing an officer;

   2)  Striking an officer with a club or a blunt instrument;

   3)  The pointing of a firearm at an officer;

   4)  Advancement towards an officer by a suspect exhibiting a firearm, knife or club in a manner and in close enough proximity to the officer to give reason to believe that the officer may be assaulted;

   5)  A physical struggle in which the suspect is attempting to remove or has removed the officer's firearm or less lethal weaponry from the officer's possession.

## 9.11 WEAPONS DISCHARGE

Discharge of a weapon by an officer is prohibited:

A.      As a warning shot;

B.      In misdemeanor situations, except those instances consistent with paragraph 9.05 B;

C.      Solely to protect property;

D.      From a moving vehicle, at a moving vehicle, or fleeing vehicle, except where any of the occupants of said suspect vehicle are discharging or attempting to discharge a firearm at or in the direction of the officer or a third person, or the suspect vehicle is pursuing an officer who is trapped with no possible avenue or means to escape the suspect vehicle;

E.      To effect an arrest or prevent an escape, unless immediately necessary to protect the officer or another from death or serious bodily injury; and

F.      Randomly into buildings or other places where offenders are hiding unless immediately necessary to protect the officer or another from death or serious bodily injury.

## 9.12 DEADLY FORCE AGAINST ANIMALS

A.      Deadly force is sometimes required against animals. It may be used by an officer to protect self or another from serious bodily injury when no reasonable alternatives exist.

B.      Except in the above instances, an officer's supervisor must approve the killing of a dangerous animal or one that is so badly injured that humanity requires it's removal from further suffering. When expediently possible, it is referred, but not mandatory, that the permission of the owner be obtained unless it is a wild animal.

## 9.13 REQUIRED REPORTS

A.      When a deputy requires any force to effect an arrest, subdue, or control an arrested person or prisoner; or in any other situation, the deputy shall fully document and described in writing the reasons for the use of force in the BCSO report. A detailed descriptive version of the facts leading up to the officer's use of force is required. A phrase similar to "only necessary force was used to subdue the situation" is not satisfactory and should be avoided. The report should include the cause of the situation, including verbatim as much as possible the words of the subject, and any actions or other facts pertinent which caused the Deputies to respond with force. All deputies who witnessed or participated in the incident should submit a narrative report. The deputies' supervisors should be notified as soon as possible.

B.      In conjunction with reporting requirements, immediately notify the Deputy Chief and Sheriff whenever deadly force is used.

**9.14 INVESTIGATIONS REQUIRED**

A.      Other than complete reports required in paragraph 9.09 above, no separate investigation is usually conducted unless a complaint is received making specific allegations against the deputies involved. If required, the Professional Standards & Integrity Division will conduct the investigation.

B.      In instances of shots fired, two distinctions are drawn:

> 1.   An officer's supervisor is notified if there is an accidental discharge of a weapon by an officer or shots are fired by an officer resulting in no hits. During the officer's off-duty hours, the ranking Patrol Supervisor shall ensure that the affected Division Chief is notified for purposes of investigation.

> 2.   Immediately notify an officer's supervisor when shots are fired and a person is hit. During the officer's off-duty hours, the ranking Patrol Supervisor shall ensure that the Chief, Criminal Investigations Division, is notified for purposes of investigation.

**9.15 NOTIFICATION TO SHERIFF**

Any time an officer fires a weapon, on or off-duty in the absence of personal sport or for training purposes; it shall be the duty of the supervisor receiving the information to insure the Sheriff is notified.

**9.16 VIOLATIONS OF POLICY**

A.      Violations of this policy and philosophy require an investigation reportable to the Bexar County Sheriff's Office and will result in appropriate disciplinary action.

B.      Approval to carry and/or use of any authorized weapon or device on duty may be revoked, by the Sheriff or the Sheriff's designated representative, at any point that a Deputy has demonstrated an inability or unwillingness to strictly adhere to established organizational policy regarding the use of such weapon or device.


**APPENDICES:**


A – Impact Weapons.
B – Electronic Control Devices (ECD).
C - Oleoresin Capsicum (OC) pepper spray (chemical agents).

**APPENDIX A - USE OF NON DEADLY FORCE – IMPACT WEAPONS**

**A-9.1. ASP® – EXPANDABLE BATON**

A.     The authorized ASP® expandable batons may be used whenever force is legally justified and lesser methods have failed or are impractical under the circumstances.

B.     The ASP® batons are not designed to be used as a club or bludgeon and should not ordinarily be raised above the head to strike a blow to any person in non-deadly force situations.  Blows with the ASP® batons should be short and snappy and delivered only to incapacitate temporally or to deter the adversary (such as blows to the shins, knees, and elbows).  When used properly, in accordance with this policy, the use of ASP® batons are considered the most dramatic form of non-deadly force and it must be undertaken prudently.

C.     Blows with the ASP® baton to the head or neck, or blows capable of inflicting permanent injury shall be made only where deadly force is permitted under this chapter.

D.     Striking an adversary with the officer's hands or feet is usually considered non-deadly force, however, strong blows to head, face or throat or repeated blows to these areas with the hands or feet can be considered as deadly force.

E.     Striking an adversary with a flashlight is prohibited in non-deadly force situations.

**APPENDIX B – ELECTRONIC CONTROL DEVICES**

**B-9.1 BAND-IT™ (ECD)**

A.      Court Security Division, Judicial Services Division & Detention Division Commanders or their designees shall assign the BAND-IT™ to deputies for use on inmates who fit predetermined criteria listed below in section F.

B.      Commanders or their designee shall log each BAND-IT™ issued on an Equipment Inventory Log. The log shall denote the BAND-IT™ unit number, date/time issued and date/time returned.  When not in use, the BAND-IT™ and wireless transmitter shall be returned to the secured storage area and ensure the device has an adequate charge for the next use.

**NOTE:** The initial charge of the BAND-IT™ should be no more than ten (10) hours, and six to eight hours for subsequent charges.

C.      Each deputy assigned a BAND-IT™ shall conduct a pre-service inspection of the device and the wireless transmitter to confirm its condition, the inspection shall consist of:

> 1.   Verifying the identifying numbers on the transmitter and receiver match.
>
> 2.   Ensure the device is clean, charged and serviceable.
>
> 3.   Conduct a function check of the device.

**NOTE:** In the event the BAND-IT™ fails the pre-service inspection the assigned deputy shall notify their supervisor.  The device shall be taken out of service until necessary repairs are made.

D.      BAND-IT™ USAGE

> 1.   Deputies who are assigned to the Court Security Division will use the BAND-IT™ in conjunction with a locking transport leg brace.  The division/shift commander shall be notified immediately when the band-it™ has been deployed.
>
> 2.   Deputies are authorized to use the BAND-IT™ without prior approval, in cases where the threat is both credible and imminent.  All personnel who have been assigned a BAND-IT™ must comply with the Manual Chapter 8 (Authorized Weapons, Training & Related Matters) and Chapter 9 (Use of Force).  The BAND-IT™ may be applied to a detainee under the following circumstances:
>
>> a.   The detainee has a prior history of:
>>
>>> 1)   Escape or escape attempts.
>>>
>>> 2)   Violence or have made threats of violence against themselves or staff.
>>>
>>> 3)   Displaying disruptive behavior.
>>
>> b.   The detainee's physical size and stature is overbearing.

**Effective date April 30, 2014**                                    111

    c.   If the detainee is wearing civilian attire while in custody at court proceedings.

    d.   The detainee has a high profile case such as a death penalty case.

    e.   A detainee is under extradition.

    f.   At the direction of a supervisor.

3.   Due to the ECD's potential to cause serious injury, this device shall only be used in the following circumstances.

    a.   To overcome a subject whose active aggression is an immediate or credible threat to the safety of the deputy(s), the public, or themselves.

    b.   To overcome active resistance or escape.

    c.   To prevent escape from custody.

4.   Whenever possible, a verbal announcement of the intended use of the BAND-IT should precede the application of the device in order to:

    a.   Provide the individual with a reasonable opportunity to voluntarily comply.

    b.   Provide other deputies and individuals with warning that a BAND-IT™ may be deployed.

5.   Deputies should consider the potential for serious consequences before deploying the BAND-IT™ in the following situations:

    a.   In potentially flammable or explosive environments.

    b.   On individuals who are passively resisting.

    c.   On individuals operating a moving vehicle or machinery.

    d.   On individuals who could fall from a significant height.

6.   The BAND-IT™ shall not be used on individuals who may be at a greater risk of harm including:

    a.   Individuals with known neuromuscular diseases.

    b.   Individuals with known heart problems.

    c.   Pregnant women

7.   When activating the BAND-IT™, deputies shall use it for one standard cycle then stop to evaluate the situation. If subsequent cycles are necessary, the cycles should not exceed three activations when possible. The number of cycles will be documented in a report and

include an explanation of why the additional cycles were necessary and how the person responded after each cycle.  An evaluation of the activation shall be done after each cycle.

8.  The BAND-IT™ shall not be used on a subject who was previously subdued by an Electronic Control Device within the last 24 hours.

9.  Following the use of the BAND-IT™, deputies should use a restraint technique that does not impair the subject's respiration.

    a.  The location and type of incident shall be reported to the Division/Shift Commander and a supervisor will respond to the scene.

    b.  Upon compliance of the subject, photographs will be taken of the electrode contact area and / or any subsequent injuries.

    c.  Whenever the BAND-IT™ is deployed, an offense or incident report shall be generated to document the deployment.

        1)  A detailed description of each method of force utilized in attempting to control the subject will be documented in each of the reports.

NOTE: At the supervisors discretion an Evidence Unit will be dispatched to the deployment location for photographs of the electrode contact area. The photographs will be documented in the deputies Offense/Incident Report and copy of the photographs or CD will be placed into the Property/Evidence Room.

        2)  A Shift Sergeant will approve all reports, and a copy of the report will be forwarded through the Chain of Command to the Division/Shift Commander.

        3)  Upon successful review of the incident, the report will be maintained per the Bexar County Sheriff's Office Records Retention Policy.

    d.  In the event of an accidental discharge, the Division/Shift Commander shall be immediately notified.  A report will also be written.

**APPENDIX B – ELECTRONIC CONTROL DEVICES CONTINUED:**

**B-9.2. TASER™ (ECW)**

The Taser Proficiency Control Officer (TPCO) manages all BCSO issued/approved Tasers along with training for the Bexar County Sheriff's Office. The TPCO provides the Chief of Training with a final report on all Taser training and Taser inventory status.

A.      PROCEDURES WHILE ON OR OFF DUTY

1.  When deploying the TASER™ (ECW) deputies will only use the drive stun mode when exigent circumstances prevent the use of the probe mode.

2.  Personally owned/purchased ECW's are authorized to be used by deputies outside of the Adult Detention Center acting in a law enforcement capacity.

3.  Personally owned ECW's shall be the Make, Model and Color as prescribed by the Bexar County Sheriff's Office Training Academy

4.  In addition to the guidelines set forth by Chapter 9 of the Manual, deputies may deploy an ECW to deter vicious or aggressive animal that threatens the safety of the Deputy or others.

5.  Once deployed the ECW will be used until the threat is neutralized.  When the behavior that justified the use of the ECW ends, the Deputy will stop the use of the ECW.

    a.  Deputies shall only deliver the number of exposure cycles as reasonably necessary to control the subject.

    b.  If cover deputies are available, they should attempt to place restraints on the subject during the exposure cycle.

    c.  An evaluation of the ECW's effects should be conducted after each exposure cycle and the level of force used should be adjusted as needed.

B.      RESPONSIBILITIES

1.  Deputies should consider the potential for serious consequences before deploying the ECW in the following situations due to a higher probability of injury to a subject:

    a.  In potentially flammable or explosive environments.

    b.  On individuals who are passively resisting.

    c.  On individuals operating a moving vehicle or machinery.

    d.  On individuals who could fall from a significant height (i.e. subjects on stairs, fences or tops of roofs, etc.).

    e.  On subjects in a body of water due to a danger of drowning.

    f.   Women subjects known to be pregnant.

    g.   The obviously frail or infirmed.

    h.   The elderly

2.   A Deputy will not display or deploy an ECW in a public place except for official use or for inspection by a supervisor.

3.   Actions Following the deployment of the ECW:

    a.   Deputies should keep the subject under observation and ensure that the subject is restrained in a manner that does not interfere with their breathing.
    b.   Medical personnel are summoned to the scene once it is safe. Medical personnel will evaluate the subjects need for medical treatment.

    c.   The expended cartridge, probes and AFID's are collected and placed into evidence. Deputies should treat the expended probes as a Biohazard due to the presence of bodily tissue and fluids.

    d.   Deputies will use standard procedures when submitting this evidence to the evidence room.

        1)   Before being placed into evidence receptacles, used probes shall be inserted, point down, into the expended cartridge and then covered with biohazard tape,

        2)   The wires should not be wrapped around the cartridge.

        3)   All evidence submitted must have a case number generated through the Public Safety Communications Center. An N-Code has been established for the Adult Detention Center (ADC) to use. Deputies turning in ADC evidence will only be required to turn in the marked evidence with a copy of a completed BCSO 351-409, Less Than Lethal Deployment Form.

4.   Actions following an accidental discharge:

    a.   Summon medical aid to the scene, if necessary.

    b.   Notify the on-duty supervisor.

    c.   Submit appropriate incident and supervisors reports to the appropriate divisional issuing authority after the supervisor's investigation. Contents of the incident report are listed in section 7b.

    d.   Account for and properly discard the expended cartridge if it is of no evidentiary value.

5.   A deputy who deploys an ECW will report the incident as follows:

a. A deputy who deploys or who threatens to deploy an ECW, in order to accomplish a lawful objective in the performance of their duties, will verbally notify the on-duty supervisor as soon as time and circumstances permit.

b. The deputy will also file a report with the supervisor immediately following the event or prior to the conclusion of the deputy's current shift. Details will include:

   1) Specific circumstances leading to the deployment.

   2) List of all deputies involved in the incident.

   3) The distance from which the ECW was used.

   4) The serial numbers of all cartridges expended.

   5) Information of medical units which responded.

   6) The results of any medical evaluation.

   7) For the purposes of compiling statistics and determining the agencies future training needs a BCSO 351-409, Less Than Lethal Deployment form will be completed and forwarded to the Training Academy.

c. A Supervisor who deploys or displays an ECW will make notifications and file a report with their supervisor prior to the conclusion of their current shift as listed above.

d. A deputy who deploys and ECW shall as soon as possible take the ECW to the Training Academy for download (deploy record) and to replace the deployed cartridge.

**NOTE:** If a deputy, who deploys an ECW, is physically affected by the deployment and is injured or incapable of filing the aforementioned required report, the deputy's supervisor will file a complete supervisors report as soon as possible pending further departmental investigation.

C.   Inspections/ Maintenance

   1. Any damage to or malfunction of an ECW/ECD will be documented and reported to a supervisor and the training academy.

   2. Only BCSO issued/approved ECW's/ECDs are to be carried or used on duty.

   3. ECW's/ECD's shall be kept clean of dirt and dust.

   4. ECW's/ECD's shall not be disassembled.

   5. All data downloads and updates will be conducted by authorized BCSO Training Instructors.

   6. The TCPO issues all cartridges and DPM's for BCSO and authorized personally owned Tasers.

7. Any maintenance performed on BCSO owned Taser will be done by the TCPO/Authorized BSCO Training Academy personnel.

8. The maintenance of a personally owned Taser in the responsibility of the deputy.

**B-9.3. MEDICAL TREATMENT**

A.   Persons who have been subjected to an ECD/ECW shall be treated as follows:

1. IF THE SUSPECT LOSES CONSCIOUSNESS, DEPUTIES SHALL IMMEDIATELY SUMMON EMS TO RESPOND TO EVALUATE THE SUSPECT

2. Once in custody, the subject shall be examined by EMS. If necessary, the subject may be transported to a local hospital emergency room or other approved medical care facility. The transporting deputy shall advise the medical staff that the person was subjected to the TASER, the approximate time the action occurred and number of cycles.

3. ACCEPTING INTO CUSTODY: The use of an ECD/ECW will be noted on the arrest report and booking form. The deputies will advise the booking Sgt. and booking intake deputy that the ECD/ECW was used to control or arrest the subject.

**APPENDIX C – OLEORESIN CAPSICUM (OC) PEPPER SPRAY (CHEMICAL AGENTS)**

A.     PURPOSE

The purpose of this policy is to define and establish guidelines for the training, carrying and the safe, effective, and humane use of Oleoresin Capsicum (OC) aerosol/foam agents by deputies of this agency to achieve lawful objectives. The guidelines established shall apply to all Deputies certified to carry/utilize this agent.

    1.   Authorized Training and Certification Requirements

    2.   All Deputies authorized by their respective administrators to carry OC when performing their official duties or while acting within the scope of these duties must be trained and certified to carry and deploy OC. 2. Personnel authorized to carry OC must attend an eight-(8) hour block of certification training covering the following subjects: History, considerations, SICDS, decontamination procedures. Each authorized individual will receive a full facial exposure to OC. Full facial exposure is only required once during initial certification. Annual re-certification is required to maintain authority and certification to carry OC. The carrying of OC is optional; however, any officer choosing to carry OC as a force option is required to comply with this paragraph in its entirety. B. Approved Equipment/Authorized Manufactures/Approved Unit Sizes.

B.     PROCEDURES

    1. The following are the only approved OC deployment devices for Deputies of this agency:

        a.   Personal defense units not to exceed 2.0 oz. with a flip-top safety device, and a single piece canister.

        b.   Spray pattern shall be a Ballistic stream or Jet-foam.

        c.   Scoville heat units will not exceed one million SHU'S. d. OC percentages: Ballistic stream:

            1)   Will not exceed 5.5% Jet-Foam: Will not exceed 10%

            2)   Approved chemical agents:

                a)   5.5% PEPPERMACE

                b)   10% PEPPERFOAM

                c)   5.5% OC Spray

                d)   First Defense 10% OC Foam

            3)   Approved Unit Size

                a)   Deputies assigned to Patrol, CID and similar units are authorized to carry 5.5% PEPPERMACE in the MK III or MK IVB size unit.

b) Deputies assigned to duties in the Court Security Division are authorized to carry 10% PEPPERFOAM in the MK III or MK IVB size unit.

c) Deputies assigned to the Detention S.E.R.T. unit are authorized to utilize 10% PEPPERFOAM in the MK IX size units.

d) Deputies assigned to S.W.A.T. units are authorized to utilize 10% PEPPERFOAM AND OR 5.5% PEPPERFOAM and/or 5.5% PEPPERMACE in the MK IX size units.

**NOTE:** No other manufactures or formulations will be authorized without written authorization of the Sheriff.

C.   Approved Carry Techniques/Required Carry Equipment

1. Strong side, nozzle to centerline, forward of duty weapon, drawn with weak hand, strong hand used for reaction/weapon hand.

2. Offside, nozzle to centerline, directly behind magazine pouches, drawn with off- hand, strong hand used for reaction/weapon as needed.

3. Individual preference, carry in manner most comfortable to deputy, nozzle to centerline, use either hand to draw and spray.

4. Deputies authorized and certified to carry OC shall carry the OC canister in a belt holster pouch designed to fit the size canister being used or issued. Materials and closures will be in accordance with the standards listed in chapter 7 of the Sheriff's Manual of Policy and Procedure.

D.   Deployment Techniques

1. DRAW.

2. Use thumb or index finger to activate,

3. Spray quickly into face area,

   a. eyes, nose, throat is the target area

   b. spray a 1 to 3 second burst

4. Distance yourself from subject,

5. Protect your OC canister as you would a firearm,

6. Keep moving around subject,

7. When the OC has taken effect, move in and control subject.

**Effective date April 30, 2014**                    119

8. After gaining control, start decontamination procedures,

9. Assess subject for possibility of SICDS,

10. Read subject the OC Administrative Warning, (Appendix 1)

11. Transport subject. Continue evaluation for SICDS,

12. Inform booking personnel of subject's exposure to OC.

13. Document use of OC on required report forms.

E.   Decontamination methods and approved supplies

**NOTE:** All deputies of this agency who utilize OC and deploy the agent shall follow the below listed procedures for subject and personal decontamination:

1. FRESH AIR: Deputies/subjects that have come in contact with OC should immediately be removed from the contaminated area. Once in fresh air, remain upright and breathe deeply to clear out the effects of the OC. Normal breathing should return in a matter of minutes. If the deputy/subject has any difficulty breathing, afford them immediate medical attention (Hospital or EMS unit).

2. FREE FLOWING COOL WATER: This will allow exposed individual the ability to open their eyes. Normal eye functions with the use of water will return in about 10 to 15 minutes. If water is not available, roll down the windows in the car when transporting the subject and the wind will help eye functions return. This procedure will take longer than free flowing cool water. Water may be obtained from citizens in the field. Deputies should carry 1 to 2 gallons of distilled water and a spray bottle.

3. SOAP AND WATER: Once the subject arrives at the holding facility, afford them the use of soap and water to remove the OC resins from the skin. If possible, do not use oil-based soaps. The oil will coat the skin, sealing the OC to the exposed area. At no time should any salves/creams be used for the burning sensation on the skin. The burning sensation on the skin should subside in about an hour. Fair-skinned people may take a longer period of time. The burning sensation is uncomfortable but is not life threatening. Always remember to use cool free flowing water.

4. CONTACT WITH SUBJECT: Do not leave the exposed subject unattended at any time. Remain in constant contact with the subject to ensure their safe recovery from the effects of OC. Check the subject's upper chest area for residue from the OC spray. If the residue is present, remove and replace the contaminated clothing. The residue in the clothing could cause the subject to have difficulty in breathing. As mentioned previously if the subject has any unusual effects, afford them immediate medical attention.

F.   Decontamination Supplies

1. "Cool-It"

2. "Bioshield"

3. "Rescue"

4. "Sudecon"

5. "Baby Shampoo", any commercial "no-tears" baby shampoo; and,

6. Paper towels: each unit should be equipped with 1 or 2 rolls of paper towels.

G.     Required Reports

In addition to the standard report forms required by each division, a Less than Lethal Deployment Form (BCSO FORM 351-409) will be directed to the Chief of Training when any less lethal weaponry is utilized. The completed report must be submitted to the Training Academy no later than two (2) days after the incident.